PASSAIC COUNTY COURT OF COMMON PLEAS.

HARRY RIGHTMYER, PLAINTIFF-APPELLEE, v. TOTOWA BOROUGH, RESPONDENT-APPELLANT.

Decided July 26, 1939.

For the petitioner, *Nathan Rabinowitz* and *Isadore Rabinowitz.*

For the respondent, *Edwards, Smith & Dawson.*

DELANEY, C. P. J. On September 21st, 1932, the petitioner-appellee, a police officer of the borough of Totowa, filed a formal petition for compensation for an alleged one hundred per cent. permanent disability resulting, so he claimed, from a violent assault and battery upon him on November 14th, 1931, while in the performance of his duties. Respondent's answer, filed October 10th, 1932, denied, among other things, that petitioner had sustained any injury which arose out of and in the course of his employment. On January 4th, 1933, after hearings on December 9th and 23d, 1932, a consent order was entered, by way of mutual compromise and settlement, in favor of petitioner for fifty per cent. of permanent total disability (two hundred and fifty weeks at $20 a week), besides allowances to doctors and counsel. This disposition of the matter, then supposed and intended by the parties to be final, was reached without the offering of any evidence touching the alleged assault and battery.

On October 30th, 1936, when the terms of the consent order of January 4th, 1933, had been carried out, a petition was

filed for increased disability under section 21-F of the Workmen's Compensation act, but soon withdrawn (it being deemed a mistaken course). In the stead of it, petitioner applied, on notice to respondent, to set aside the order of January 4th, 1933, on the ground that the order represented only an agreed settlement between the parties, adopted by the bureau, and was not a final adjudication upon the merits. Over the objection of the respondent, the cause was reopened; and on March 6th, 1938, after protracted hearings upon the merits, a new and enlarged award was ordered in favor of the petitioner, crediting respondent with the sums paid under the settlement of January 4th, 1933. From the enlarged award respondent appeals.

Among numerous questions, the primary one is, did petitioner sustain on November 14th, 1931, an injury arising out of and in the course of his employment?

Difficulties are encountered here. In the first place, there is a variance, wide enough to arrest attention, between the averments of the original petition of September 21st, 1932, and the proofs on behalf of petitioner (as received during the hearings on the merits about five years later). The original petition alleged, in substance, that the petitioner was called into a place (admittedly a "speakeasy" of prohibition times) to quell a fight and avert a robbery and holdup, and was hurt in that endeavor; but the proofs ran to the effect that he was set upon by one or both of two intoxicated patrons, the same referred to in the petition, outside of the speakeasy, while trying to prevent their driving away in an automobile belonging to one of them. The abandoned petition of October 30th, 1936, drawn by his present counsel, was framed upon the latter, not the former, theory.

But the variance settles nothing.

The circumstances, the details, the severity of the assault and battery of November 14th, 1931, are sharply disputed; but of its actual occurrence there is no question; on all sides it is admitted. The counsel who drew the original petition got his facts nearly a year after the occurrence, not from the petitioner, but at second-hand from petitioner's wife. During the interval the petitioner had undergone a major

and critical operation—the removal of a tumor from his brain. The petition bears, not his accustomed signature, but only his mark. On the hearings in 1937, his speech was so halting and infirm that the deputy commissioner, before whom he testified, observed that he would take judicial notice of it; and the evidence—the uncontradicted evidence—is that in September, 1932, his wife talked with his then counsel because he was vocally unable to do so. As to a threatened robbery, there is this trace in the record: one of the intoxicated customers accused the bartender in sole charge of the place with shortchanging him, and remarked, in effect, that he was at liberty to help himself from the cash register; the petitioner, who, as some say, had then lately entered the place in civilian dress, a stranger to the two intoxicated customers, went out at this point, and going to his nearby home got there his police badge and nightstick, and there saw his wife; he returned, using his car, to the speakeasy, and shortly afterwards reappeared in his home, holding his fractured set of false teeth in his hand, and with external signs of bodily injuries.

In the solution of the difficulty arising from the variance between pleading and proof as of other difficulties in the cause, common sense and common knowledge and common experience cannot be shut out. Practitioners, who have drawn pleadings on facts obtained by them second-hand, know the hazard of relying upon the informant speaking in good faith but endeavoring to report what has come only indirectly to his knowledge.

In these explanatory circumstances I do not find the significance in the variance which counsel for respondent perceive in it.

But confronting difficulties remain. There are contradictions and inconsistencies in the testimony of petitioner's witnesses on the particulars of the assault and battery of November 14th, 1931. These might all be occasioned either by witnesses coming to his support with knowingly false stories imperfectly harmonized, or by witnesses honestly struggling, after the lapse of five or six years, to recall details never of great personal consequence to themselves.

Not all the differences in the versions of petitioner's wit-

nesses are troublesome; some are readily reconciled or dismissed by a shift of the scene and the movement of time. Supposing, as counsel for respondent do, that their stories are fabricated. I would have expected a closer agreement in their testimony, at least, upon direct examination, at which early point most of the marked discrepancies appear. After careful study of the record, I have concluded that these witnesses, with fading and variant memories as to certain details, recall and state the essence of the matter. They testified, to what had occurred, not days or weeks or months, but years, before they were sworn; and the element of lapsed time must be taken into account.

On a pivotal point, I find that respondent's witnesses, the alleged assailants of petitioner, are discredited. They say (and about this there is no disagreement or doubt) that they were in the speakeasy from two o'clock in the afternoon of Saturday, November 14th, 1931, until seven or eight in the evening, playing bagatelle—their week's work ended—and spending their money in lunching, in the drinking of ale and apple whiskey, in the treating of other customers of the house. They further say that petitioner, whom they had never met and whose official character they did not guess, was in the same place, in civilian clothes, between the same hours and for the like length of time. It is undisputed that petitioner went off duty at noon on that day, and went back on duty at four o'clock in the morning of the following day. He says, and his wife corroborates him, that he spent the afternoon in his home, and first left that at about seven o'clock in the evening. He says also, and the bartender, his brother-in-law, corroborates him, that he entered the speakeasy for the first time on that day after seven in the evening.

Whether petitioner spent that Saturday afternoon and early evening in the speakeasy, drinking apple whiskey to the point of stumbling intoxication, as the alleged assailants say, or first entered there, in a state of perfect sobriety, after seven o'clock in the evening, as the petitioner and the bartender say, is a matter of capital importance. If the alleged assailants are right, their version of their physical encounter with the petitioner is powerfully strengthened; if they are wrong,

they are either willfully wrong, or were themselves so far inebriated on the occasion that their present recollection of its occurrences is quite valueless.

On this question the petitioner and the bartender are corroborated by a third witness—a milk dealer and member of the township committee of a neighboring municipality, who, so far as the proofs reveal or suggest, is without interest in the controversy. His acquaintance with petitioner seems to have been very casual and slight. His unshaken and, so far as may be perceived, unbiased testimony throws the weight of the proof on the side of the petitioner. The alleged assailants say that two of their friends, whom they name, were in the speakeasy for a while in the early afternoon, when petitioner, as they say, was there. Respondent called neither friend, and suggests in its brief that neither could have recalled what stranger, if any, was also there; and this may be so.

Up to the time of the fight, petitioner's alleged assailants were frequent patrons of the place. The evidence is that they did not go there again until long after the occurrence, and when at length they returned, the proprietor, although he and they were old acquaintances—all of them having formerly worked for a common employer—immediately put them out. These facts were uncontroverted, and if they have any significance, the significance was not explained away.

Finally it is argued that when an officer is hurt in the line of duty, the news of it ordinarily sweeps through the department, and the fact seems to be that two, including the chief, of the four members of respondent's police force, first learned of petitioner's misadventure many months later. I suppose, however, that if scandal touches a policeman—his involvement, for example, in a private brawl which his own drunken misbehavior has invited—some rumor of it usually reaches all the members of the force on wings quite as swift, and I find nothing helpful in the argument.

After painstaking consideration, I conclude that it has been established that the assault and battery upon petitioner resulted, not from an unwarranted intrusion, but in an effort to do his duty.

The next question is: Did respondent, petitioner's employer, receive timely notice of his injury?

In November, 1931, its police department consisted of two patrolmen (of whom petitioner was one) and a chief and a captain. The chief testified that his earliest notice of the incident came in July, 1932, when petitioner complained of illness (which the chief says was then plainly visible) and applied for a leave of absence. It is claimed on behalf of the petitioner that the captain of police was notified on the evening of the accident. If this is true, it seems to suffice, the chief having testified, and nothing to the contrary appearing, that the captain was petitioner's immediate superior. *Granowitz* v. *Hay Foundry and Iron Works,* 9 *N. J. Mis. R.* 1165; 157 *Atl. Rep.* 130; *affirmed,* 109 *N. J. L.* 394; 162 *Atl. Rep.* 582.

There is direct evidence of such notice. Respondent procured the attendance of the captain in the Compensation Bureau in December, 1932, during the hearings terminating in the settlement of January 4th, 1933; but he was not then sworn, and has since died. Petitioner's witnesses on the point of the notice were his wife and her brother, the bartender (the latter having taken petitioner home after his injury). There appears to be some variance in their respective testimony. Petitioner's wife said that the captain came to his home in response to a call by telephone; the bartender says that he went out for him, but does not say or intimate that the captain was not brought, by one means or another, to petitioner's home. Both agree that he counseled that the matter should not be pursued, and if he reasoned about it as they report, it is understandable—the episode having resulted from the carrying on of a then outlawed traffic, out of which the policeman petitioner's brother-in-law got his living. In this day speakeasies existed only by the grace and tolerance of the communities, and when some untoward incident brought them to the official notice of the authorities, there was public stir and criticism and reproach; and the reproach always centered upon the police.

Respondent argues that there is a presumption that the captain, if notified, would have performed his duty, and found

and arrested petitioner's assailants. But the presumption, like most others, is rebuttable. It was not supposed on the night of November 14th, 1931, that petitioner's injuries were serious; the grave consequences which are now claimed to have developed from them were not then foreseen; for one reason or another not every known infraction of the criminal law is followed up; and the reported story of the captain's attitude and counsel cannot be rejected either as incredible or improbable, all the admitted or proven circumstances considered.

When the petitioner's failing health led to his application for a leave of absence in July, 1932, it was from the captain that the chief of police got his first knowledge that the petitioner had been hurt by intoxicated assailants; and this is the testimony of one of respondent's own witnesses—the chief himself. Someone at some time, it is manifest, had informed the captain; the bartender and the petitioner's wife say that they were his informants, and that they imparted the information on the very night of petitioner's injury; and in the whole range of the proofs there is nothing to show that he got his information at any other time or from any other quarter.

To what the captain would have testified in the Compensation Bureau in December, 1932, I do not know, but respondent then knew, and, knowing, consented to paying petitioner the sum of $5,000, besides fees of his physicians and counsel, and now, after the death of the captain, when his evidence has become unavailable, asks me to substitute unsupported suspicion and random conjecture for affirmative proof.

I find that respondent received due notice of its employe's injury.

There is sufficient proof also that petitioner's injuries aggravated a pre-existing condition and contributed to his disability.

The right of the Compensation Bureau is clear to open in 1936 the earlier voluntary settlement between the parties, approved by it without a final adjudication on the merits. *Strengs Piece Dye Works, Inc.,* v. *Galasso,* 118 *N. J. L.* 257; 191 *Atl. Rep.* 874; *P. Bronstein & Co.* v. *Hoffman,* 117 *Id.*

500; 189 *Atl. Rep.* 121. The cases of *King* v. *Western Electric Co.,* 122 *N. J. L.* 442; 5 *Atl. Rep.* (2d) 490; *Franzoi* v. *Jacob Rabinoll, Inc.,* 119 *N. J. L.* 184; 195 *Atl. Rep.* 305, and *Breen Iron Works* v. *Richardson,* 115 *Id.* 305; 180 *Atl. Rep.* 192, cited in respondent's brief, are not to the contrary.

The final question is: What is the extent of the petitioner's permanent disability?

On the earlier hearings (1932-1933) three of the four doctors who then testified, found him to be permanently and totally disabled. What the fourth, Dr. Davidoff, the surgeon who removed the tumor, said of him led to the same conclusion.

When the case was reopened (1936-1938), the three physicians who were called by respondent, agreed that the permanent disability is only forty per cent. of total, but in 1932, two of them had considered the disability as permanent and complete.

Of petitioner's four experts, one pronounces him "as an industrial unit," to be totally and permanently disabled. Dr. Cremins, who had treated petitioner in March, 1932, and from that time until his operation, and for several years afterwards, and who had observed him much longer than all the other physicians together, was asked by petitioner's counsel a question of great weight and moment: "Doctor, in your opinion, would you say that this man was industrially unfit to perform the ordinary and useful pursuits of life?" Objection was interposed, not to the form of the question, but on other grounds; and in making an effort, by asking supplemental questions, to meet the objection, the mind of counsel seems to have been diverted by the interruptions— with instances of which the record is replete—and the question went unanswered.

It was proved that, except for an occasional and ineffectual endeavor to use a rake in his own dooryard, petitioner, in fact, has done no work since July, 1937; and that he has since always been under the eyes of his wife or his child, or, when the one was at work and the other in school, in the care of his mother. The evidence is that at irregular intervals since the operation of 1932, petitioner has suffered from epi-

leptic seizures; that at times they have been frequent, occurring weekly or every two weeks; that they once disappeared for six months together, and then suddenly recurring, appeared with their former frequency; and that their visitation is intermittent, with no fixity of time periods.

Testifying in September, 1937, petitioner's wife said that the last seizure at that time had occurred in the preceding May. All of respondent's witnesses assumed in their testimony in December that petitioner had suffered no convulsions since May, and condition their estimate of his disability on that assumption. They all assumed more—that the epileptic spells were progressively decreasing, and would ultimately disappear.

What was petitioner's general physical condition at the closing of the proofs in December, 1937? At that time—five and a half years after the removal of the tumor from his brain—he still had a partially paralyzed face, limited motion in his right shoulder, numbness in his right hand (both front and back), tremulous fingers, a dragging right leg, a "residual" paralysis of the right side, a tremulous tongue diverting to the right, a hesitant speech, understandable only with an effort on his part and painstaking attentiveness on the part of his listeners, and at times (as appears in his own recorded testimony in the case) a strange structure of sentence.

There has been some improvement in him since the three or four month period immediately after his operation. His right arm then hung limp, now there is motion there, although, as all the doctors find, "limited and restricted;" the paralysis on the whole of his right side—the body and the upper and lower limb—seems somewhat less severe now than then; with mutual effort, his speech is intelligible now.

But he cannot use a pen; in September, 1937, he was still unable to write.

If, with epileptic convulsions appearing at times and on occasions which no one can foresee, he could obtain employment and keep it, at what can he work? Dr. Finke, who said that "he can probably do something," found himself at a loss to say what it is. The three doctors, who ignoring in

their computations his epileptic seizures, estimated his permanent disability at forty per cent., offered no suggestion.

Economically and industrially considered, he is of as little utility now as in 1932.

Respondent's doctors expected some further improvement. Their optimism is valueless unless rooted in the proofs. I have searched the record for support of it, and am obliged to conclude that the prophecy of future betterment rests on nothing but sheer conjecture and bare surmise, and to agree with the deputy commissioner, who observed the petitioner, both on the hearings of 1932-1933 and of 1936-1938, that within the meaning of the Workmen's Compensation act, petitioner's disability is permanent and total.